# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| KAREN DOWNARD, | : |
| Plaintiff, | : Case No. 2:17-CV-560 |
| v. | : CHIEF JUDGE ALGENON L. MARBLEY |
| SHERIFF RUSSELL L. MARTIN, ET AL., | : |
| | : Magistrate Judge Vascura |
| Defendants. | : |

## OPINION AND ORDER

### I. INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment. (ECF No. 47). The hearing on Defendants' Motion for Summary Judgment took place on December 11, 2019 at 10:00 a.m. For the reasons set forth below, this Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment.

### II. BACKGROUND

Tye L. Downard was a detective with the City of Reynoldsburg Police Department for nearly twenty years. (ECF No. 11 at 4). On Thursday, February 18, 2016 he was arrested and charged with possession with intent to distribute in violation of 21 U.S.C. §841(a)(1) for allegedly using his official position to traffick drugs. *USA v. Downard*, 2:16-mj-00097-EPD-1 (ECF No. 1) (S.D. Ohio 2016). On February 18, 2019, Magistrate Judge Deavers determined, upon the Government's motion, that Mr. Downard should be detained prior to the detention hearing scheduled for the following Thursday, February 25, 2019. (*USA v. Downard*, ECF No. 8). Mr.

Downard was transported to Delaware County Jail on the afternoon of February 18, 2019. (ECF No. 47 at 11).

A U.S. Marshall delivered Mr. Downard to the jail and placed him in the custody of Corrections Officer Amy Foley, who conducted Downard's intake. (ECF No. 47). The U.S. Marshall informed Officer Foley that Mr. Downard was a law enforcement officer and provided Officer Foley with a Prisoner Custody Alert notice which included a box marked "Psychiatric Problems" and a notation that indicated that Mr. Downard "seems despondent, but has not stated he is suicidal." (ECF No. 51 at 5, No. 51-1). Officer Foley spent about two minutes going through a Suicide Prevention Screening Guideline form with Mr. Downard that included sixteen questions and about two minutes on a twenty-three question medical screening form. (ECF No. 51 at 6). Officer Foley assigned Mr. Downard to holding cell HC6 in the jail's booking area so that he could receive near constant monitoring by staff. (ECF No. 47 at 7).

Shortly after being placed in HC6, a nurse met with Mr. Downard, measured his vitals, and screened him for health and psychological concerns. (ECF No. 47 at 7-8). The nurse reviewed the forms that Officer Foley had completed and noted that Mr. Downard denied feeling hopeless or considering suicide and that he denied having a history of psychiatric issues. (ECF No. 47 at 7; No. 47-8; No. 47-9). Mr. Downard was also visited by a nurse on the 19th, 20th, and 21st to receive medication. (ECF No. 54 at 10).

Mr. Downard stayed in HC6 until 6:09 pm on February 18. At that time, Officer George Ayers—who took over for Officer Foley and was acting pursuant to instructions from a sergeant—moved him to HC3 in the same booking area. (ECF No. 47 at 8). HC3 was in the direct line of sight of officers in the booking area and Mr. Downard also received an observation check every 60 minutes, as well as an evening meal tray. (ECF No. 47 at 8-9).

2

The next day, February 19, Mr. Downard met with the mental health clinician, a professional clinical counselor, Douglas Arnold. (ECF No. 42). During their meeting, Mr. Arnold noted:

> "TD voiced feeling the stress of his circumstances (LEO arrested for multiple counts of drug trafficking – federal charges). Conscious of the distress caused to family (wife & children), need to repair relationships, answer for his actions/suffer consequences. Voiced hope about restoring connection to loved ones, self to community/society over the course of time. Understood means for requesting to talk again.
>
> [handwritten notes]
>
> TD reported wife put "$ on his books" for phone and showed interest in talking to him. He will call her today. Had only spoken briefly to her by phone when arrested to notify her of arrest. Has his own attorney – not Pub. Defender"

*Id.* In addition to completing this form, Mr. Arnold spoke with Assistant Jail Director Jessica Jackson and informed her that he has not placed any watches on Mr. Downard at that time. (ECF No. 47-18). Ms. Jackson wrote an email to colleagues detailing her conversation with Mr. Arnold noting that Downard appeared to be:

> "aware of the reality of his situation and the serious consequences he is facing. He mentioned that he is willing and ready to pay the price for what he has done. He has a positive outlook on restoring and repairing the relationship between him and his wife and kids after putting them through this. After a discussion with Doug, it was determined that this inmate should remain in HC3 at least until Monday when Doug can talk with him again to continue closer observation."

*Id.*

Mr. Downard stayed in HC3 from February 18 until February 21 at 4:05 a.m. That morning, Officer Daniel Wallace moved Mr. Downard from HC3 to HC2, a cell still in the booking area of the jail. Mr. Downard stayed in HC2 for four hours until he was moved to the jail's C-Block at approximately 8:01 a.m. on Sunday February 21, 2016. Defendants claim that it was Sergeant Brandon Ford who decided that Mr. Downard should be moved out of the jail's booking area to the C-Block and housed in cell C-8. (ECF No. 47 at 12). Plaintiff contests this, arguing that the

3

jail records do not support this and instead argue that Officer Wallace moved Mr. Downard. (ECF No. 51 at 8).

Mr. Downard stayed in cell C-8 for the remainder of Sunday February 21st. *Id.* at 13. Between 12:33 a.m. and 12:48 a.m. Monday, February 22, 2016, Mr. Downard committed suicide. *Id.* at 13-14. During the time that he was housed in cell C-8, officers frequently conducted observation checks on Mr. Downard with the last observation check being conducted at 12:31 a.m. (ECF No. 47-4; ECF No. 47 at 13).

Plaintiff, Karen Downard, brought this suit on behalf of her husband, Tye Downard's estate, pursuant to 28 U.S.C. § 1983 alleging that Defendant Russell L. Martin, Defendant Amy Foley, Defendant George Ayers, Defendant Daniel Wallace, and Defendant Douglas Arnold violated Mr. Downard's Eighth Amendment right adequate to medical care because the officers were deliberately indifferent to the serious risk of self-harm posed to Mr. Downard. (ECF No. 11). Plaintiff further alleges that Sherriff Martin's failure to supervise/train employees in the jail contributed to the violation of Mr. Downard's constitutional rights. *Id.* Plaintiff also brings claims for wrongful death and survival under Ohio law pursuant to O.R.C. 2125.01. *Id.* All parties stipulated to the dismissal with prejudice of all claims against Mr. Arnold on May 30, 2019. (ECF No. 39). Defendants brought the instant motion for summary judgement (ECF No. 47) on July 12, 2019, and Plaintiff responded (ECF No. 51) shortly after. This matter is ripe for review.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court may grant summary judgment if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In resolving a motion for summary judgment, the court must view the facts, and draw reasonable inferences from those facts, in the

light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court must evaluate "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The party requesting summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250. Once the moving party has shown that no genuine issue of material facts exist, "the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## IV.     ANALYSIS

### A. §1983 Claims for Deprivation of Rights

Ms. Downard has abandoned her deprivation of rights claim as to Sheriff Martin and Officer Ayers, conceding "that there is no genuine issue of fact." (ECF No. 51 at 12). Thus Defendants' Motion for Summary Judgment is **GRANTED** as to this claim for those defendants.

To prevail on a claim under § 1983, a plaintiff must establish the violation of a right secured by the Constitution or laws of the United States by a person acting under color of state law. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Street v.*

5

*Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir.1996). Government officials acting in their official capacity are entitled to qualified immunity for discretionary acts which do not violate clearly established law that a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982)). To assess whether an official should be cloaked with immunity from suit, a Court is required to engage in a two-part sequential analysis. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). First, a court "must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to her, show that the defendant-official's conduct violated a constitutionally protected right." *Id.* If a violation is found, the court must then "determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Id.*

1. Violation of Constitutionally Protected Right

For the first inquiry, the Supreme Court has held that prisoners have a constitutional right to medical care pursuant to the Eighth Amendment's proscription on cruel and unusual punishment, applicable to states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). Inmates do not have an Eighth Amendment right "to be screened correctly for suicidal tendencies;" however, "prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2001); *see also Perez v. Oakland Cnty.,* 466 F.3d 416, 423 (6th Cir. 2006); *Grabow v. County of Macomb*, 580 Fed. Appx. 300, 307 (6th Cir. 2014).

Eighth Amendment claims that an official was deliberately indifferent to a substantial risk of harm posed to a detainee have both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires a plaintiff to show that the

medical need was "sufficiently serious." *Id.* To establish the subjective component, the plaintiff must show "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 837. Plaintiff has brought forward sufficient evidence to create a genuine issue of material fact that (1) Mr. Downard's medical need was objectively serious and (2) that officers subjectively perceived a risk of harm to Mr. Downard.

Plaintiff must point to objective evidence that Mr. Downard had a serious medical need—here suicidal tendencies—that were disregarded. *See Linden v. Washtenaw County*, 167 Fed. Appx. 410, 416 (6th Cir. 2006) (noting that there was "ample evidence" to establish objectively that prisoner had "serious medical need" where prisoner exhibited suicidal tendencies during detention); *Perez v. Oakland County*, 466 F.3d 416, 424 (6th Cir. 2006) (determining there was genuine issue of material fact regarding the objective component of Eighth Amendment claim where prisoner "denied any suicidal intention" and had not exhibited any suicidal ideations but had been previously placed on suicide watch and attempted suicide during a prior incarceration). Defendants argue that Plaintiff cannot meet the objective component because Mr. Downard did not exhibit suicidal tendencies during his stay and did not have a history of suicidal tendencies. (ECF No. 47 at 23). Plaintiff's complaint alleges that Defendants knew or should have known that "law enforcement officers charged with serious criminal offenses are often at high risk for self-inflicted harm and/or suicidal ideation." (ECF No. 11 at 5). In her response, Plaintiff also points to two pieces of evidence that support that Mr. Downard objectively exhibited suicidal ideations. One is a Prisoner Custody Alert Notice provided by the US Marshal that indicated that Mr. Downard seemed despondent; and the other is an email from Assistant Jail Director Jessica

Jackson noting that the clinical counselor, Mr. Arnold, directed that Mr. Downard should remain in the holding area under close observation by video and personal checks.[1] (ECF No. 51 at 5-7).

Taken in the light most favorable to Plaintiff, this evidence raises a genuine issue of material fact with respect to whether Mr. Downard objectively had a serious medical need. A Plaintiff meets the objective component by showing "the inmate exhibited suicidal tendencies during his or her detention or that he posed a strong likelihood of . . . suicide attempt." *Grabow*, 580 F. App'x 300, 307 (6th Cir. 2014). A medical need is considered objectively serious if it has been "diagnosed by a physician as mandating treatment *or* [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004). Although Mr. Downard was not officially put on suicide watch, until he was moved into the C-Block cell, he was treated by prison officials as if he were under suicide watch. Further, Officer Foley knew that Mr. Downard had displayed a despondent attitude and that he was a law enforcement officer, both factors that would indicate to a lay person that Mr. Downard would be at risk of suicide. In addition, Mr. Arnold, the only medical professional with mental health training, indicated that Mr. Downard should be placed under close

---

[1] Defendants contest the evidence that Plaintiff has attached to her response, arguing both documents are unauthenticated and that this Court may not consider the documents on a motion for summary judgment. (ECF No. 53 at 5, 13). Fed. R. Civ. P. 56(c)(2) provides that a party may object to evidence that "**cannot** be presented in a form that **would be admissible** in evidence." Defendants point out that the Prisoner Custody Alert Notice appears in the properly authenticated exhibit to Detective Sergeant Arthur N. Kester. (ECF No. 45-1). As to the "Offenders in Cell on 02/21/2016 14:30," Defendants do not argue that the document is not ultimately inadmissible or incapable of authentication, only that Plaintiff has failed to make an effort to authenticate the documents. After the 2010 amendments to Fed. R. Civ. P. 56, the Court is not precluded from considering such evidence if the evidence is ultimately admissible. *Foreword Magazine, Inc. v. OverDrive, Inc.,* No. 1:10-CV-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) ("Significantly, the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be"). For the purposes of this Order, the Court assumes that the documents are capable of authentication and are otherwise admissible since no contrary argument has been made by Defendants.

observation, indicating that he had concerns about Mr. Downard's mental state. (ECF No. 47-18). Plaintiff has raised sufficient evidence to create a genuine issue of material fact as to whether there was an objectively discernable serious medical need.

Plaintiff must also establish the subjective component: that Officers Foley and Wallace subjectively perceived that Mr. Downard was at risk of harm and that they disregarded that risk. *Farmer*, 511 U.S. at 837. An official is required to have *actually* perceived the risk, not merely be in a position where he or she *should* have perceived the risk. *Estelle v. Gamble,* 429 U.S. 97 at 838. Deliberate indifference to a substantial risk of harm "is the equivalent of recklessly disregarding that risk" and can be shown by inference "from circumstantial evidence that a prison official had the requisite knowledge." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008).

Plaintiff argues that Officer Foley knew that there was substantial risk of harm posed to Mr. Downard because she received notice from the U.S. Marshal's Prisoner Custody Alert that Mr. Downard appeared despondent. (ECF No. 51 at 14). According to Plaintiff, Officer Foley not only completed the standardized screening forms in "the most cursory manner imaginable," she also excluded the information from the Prisoner Custody Alert notice from her responses in the screening forms. *Id.* at 13-14. While the Prisoner Custody Alert does not indicate that Mr. Downard is suicidal—it does indicate that Mr. Downard was experiencing psychiatric problems and appeared "despondent." (ECF No. 51-1).

In addition to the Prisoner Custody Alert notice that Officer Foley received, two other pieces of evidence suggest that Officer Foley subjectively perceived that Mr. Downard was at risk of suicide. First, in responding to a question on the "Suicide Prevention Screening Guidelines" form, Officer Foley selected "YES PEACE OFFICER" to the question "Does the detainee hold a

9

position of respect in the community (such as a professional or public official) and/or the alleged crime that is shocking in nature?"(ECF No. 47-6). Second, Officer Foley decided to place Mr. Downard on administrative segregation status and in a holding cell (HC6) instead of a regular cell. Administrative segregation status is considered appropriate for those inmates who pose "a major threat to themselves" and "who by their . . . professional status . . . or by some other reason that requires segregation as a means of protecting the inmate." (ECF No. 47-19). Inmates placed on administrative segregation and held in the holding area are effectively treated as if they are on suicide watch, even if they are not officially given that status.

The evidence also indicates that Officer Wallace perceived a risk of harm to Mr. Downard. The jail briefing and pass on sheet for February 19 reflected Mr. Arnold's directive that Mr. Downard not be moved from HC3 until Monday. (ECF No. 47-16). Additionally, when Officer Wallace moved Mr. Downard to at 4:05 a.m., he moved him to another cell in the holding area, HC2, rather than to a cell in another part of the jail. (ECF No. 53 at 11).

Construing the evidence in the light most favorable to the non-moving party, there is sufficient evidence from which a reasonable jury could find that Officer Foley and Officer Wallace subjectively perceived a risk of harm to Mr. Downard.

Plaintiff has also adduced sufficient evidence that both officers recklessly disregarded the risk of harm to Mr. Downard. Officer Foley completed the intake forms in a cursory manner by selecting "No" for several questions that should have been answered "Yes" based on Mr. Downard's situation and the notice given to her by the Prisoner Custody Alert that Mr. Downard seemed despondent. For example, Officer Foley selected "No" to the following questions: "Observations of Transporting Officer: Does the arresting or transporting officer believe detainee may be a suicide risk?"; "Has the detainee experienced a significant loss within the last six months?

10

Such as loss of job, loss of relationship, death of a close family member"; "Does the inmate exhibit behavior or made statements that suggest risk of suicide or assault." (ECF No. 47-6; No. 47-7). One of the intake forms also required Officer Foley to ask Mr. Downard "Do you have any other medical issues or problems?" (ECF No. 47-7). Officer Foley wrote only that Mr. Downard has issues with heart burn and did not mention the Prisoner Custody Alert Notice despite the question specifically asking whether there were any other issues.

According to Defendants, the intake forms were shared with the nurse who did his receiving screening and the nurse "inquired into the topics addressed in the Standard Medical Questions and Suicide Prevention Screening Guidelines completed earlier by Corrections Officer Foley." (ECF No. 47 at 7). Had Officer Foley mentioned the Prisoner Custody Alert notice, the nurse would have inquired into that notice as a part of her screening. The clinical determinations made by the nurse or Mr. Arnold may have been different had the questionnaires accurately portrayed Mr. Downard's circumstances and his disposition upon transport. Here, Officer Foley withheld pertinent information from the medical personnel treating Mr. Downard that would have been applicable to their diagnoses and to their assessments of what course of treatment would be appropriate. This failure to include relevant information was in reckless disregard of the risk of harm that was posed to Mr. Downard.

Plaintiff argues that Officer Wallace knew there was a substantial risk of harm and disregarded this risk by ignoring Mr. Arnold's directive deeming Mr. Downard's presence in HC3 necessary. (ECF No. 51 at 14). Defendants contest this, arguing that while Officer Wallace did move Mr. Downard at 4:05 a.m. on February the 21st, it was only to another cell in the holding area and not to the C-Block cell. Defendants maintain that it was Sergeant Ford who decided that it was necessary to move Mr. Downard to the C-Block cell. Defendants add that Officer Wallace's

shift ended at 7:00 a.m. (ECF No. 53 at 12). Plaintiff disputes this and attaches an exhibit to her response titled "Offenders in Cell on 02/21/2016 14:30." (ECF No. 51-2). Page three of this exhibit lists the assignment of inmates in holding cell area with Downard listed as being assigned to the "Holding" cell at 4:05 am on February 21, 2016 by Officer Wallace. *Id.* In handwriting next to Mr. Downard's name is "C8," which Plaintiff claims is an indication that Mr. Downard was later moved to cell C-8 by Officer Wallace. While this form does not definitively indicate that it was Officer Wallace that moved Mr. Downard to C8, it is sufficient evidence to create a genuine issue of material fact.

Furthermore, the records submitted by Defendants have significant gaps that demonstrate a genuine issue of material fact as to who moved Mr. Downard and why. The jail's regularly kept records detailing Mr. Downard's cell assignment history are ambiguous—the last recorded cell assignment was attributed to Officer Wallace at 4:05 a.m. (ECF No. 47-11). The failure to document electronically Mr. Downard's cell assignment history after 4:05 a.m. raises genuine questions as to who moved Mr. Downard into the C-Block. The "Cell Assignment History By Booking Number" document reveals one more issue indicating that Officer Wallace recklessly disregarded a risk of harm to Mr. Downard. (ECF No. 47-11). In this form, Officer Wallace is listed as having assigned Mr. Downard to cell HC2 at 4:05 a.m. *Id.* Unlike, the other two cell assignments which list "Isolation" as the "Reason For Assignment," the reasoning provided for the final move was "General." *Id.* Mr. Arnold issued a directive that Mr. Downard not be moved from HC3 until Monday. Despite this well-documented directive, Mr. Wallace moved Mr. Downard to HC2 and changed the reason for his assignment in the process to "General." This is sufficient evidence from which a reasonable jury could determine that Officer Wallace disregarded a serious risk of harm posed to Mr. Downard.

12

### 2. Clearly Established Right

A court must also determine that the detainee's "right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). To determine whether a right is clearly established, a court "need not find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law[,] the unlawfulness must be apparent.'" *Id.* at 711. (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The right of an individual to adequate medical attention and supervision when his or her "suicidal tendencies are known" is clearly established. *Id.* at 711. Defendants understood this right to be clearly established because their proffered reason for why Mr. Downard was moved to the C-Block is that he was the only inmate in the booking area who was not on suicide or medical watch. (ECF No. 47 at 12).

### B. § 1983 Claims for Failure to Train or Supervise (Count Two)

Ms. Downard has expressly abandoned her failure to train/supervise claim noting that summary judgement is appropriate as to the sections of the complaint asserting claims of "policy, custom of tolerance, failure to train, or failure to supervise Defendants in their individual capacities" since she has not asserted a claim against Delaware County or any Delaware County officer in his or her official capacity. (ECF No. 51 at 11). Thus, Defendants' Motion for Summary Judgment is **GRANTED** as to this claim for all Defendants.

### C. State Law Claims for Wrongful Death and Survival (Counts Three & Four)

Ms. Downard has also abandoned her state claims as to Sheriff Martin and Officer Ayers since the state claims are based on the same facts and arguments advanced for Plaintiff's § 1983

claims. (ECF No. 51 at 12, 14). Thus, Defendants' Motion for Summary Judgment is **GRANTED** as to Defendants Martin and Ayers.

As to Officer Foley and Officer Wallace, Defendants claim they are entitled to summary judgment as to the state law claims because Plaintiff has no evidence that Defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner" pursuant to Ohio's statute for qualified immunity, Ohio Revised Code 2744.03(A)(6)(b). (ECF No. 47 at 33). Plaintiff concedes that Defendants did not act with malicious purpose or in bad faith and argues only that Defendants acted with reckless disregard for Mr. Downard's safety. (ECF No. 51 at 13-14).

The Ohio Supreme Court has defined "wanton" as the "failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). One acts in a wanton manner when one "is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results." *Id.* Reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* As this Court has analyzed above, Plaintiff has brought forward sufficient evidence indicating that both Officer Foley and Officer Wallace were aware of a risk of harm to Mr. Downard, and recklessly disregarded that risk. Because Plaintiff has adduced evidence creating a genuine issue of material fact regarding whether Officers Wallace and Foley acted in a reckless manner, Defendants' motion for summary judgment is **DENIED** for the state law claims against Officer Foley and Officer Wallace.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgement is **GRANTED in part** and **DENIED in part**. Defendants' Motion is **GRANTED** as to all Counts against Defendants Martin and Ayers and as to Count Two against Defendants Foley and Wallace. Defendants' Motion for Summary Judgment is **DENIED** as to Counts One, Three, and Four against Defendants Foley and Wallace**.**

**IT IS SO ORDERED.**

                                                         /s/ Algenon L. Marbley
                                            **ALGENON L. MARBLEY**
                                            **CHIEF UNITED STATES DISTRICT JUDGE**

**Dated: January 6, 2020**